ГІLᴇᴅ
08/05/2024
Tina Henry
CLERK
Cascade County District Court
STATE OF MONTANA
By: Kristin Antonovich
DV-7-2024-0000396-BC
Parker, John W
1.00

BRIAN J. MILLER
MORRISON, SHERWOOD, WILSON & DEOLA PLLP
401 North Last Chance Gulch
P.O. Box 557
Helena, MT 59624
(406) 442-3261 Phone
(406) 443-7294 Fax
bmiller@mswdlaw.com

*Attorneys for Plaintiff*

## MONTANA EIGHTH JUDICIAL DISTRICT COURT, CASCADE COUNTY

| | |
|---|---|
| ALLEN BIMLER, as personal representative of the ESTATE OF CRAIG A. BIMLER,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | DV-7-2024-0000396-BC<br>Cause No. Judge John W. Parker<br><br>**PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiff the Estate of Craig A. Bimler, and alleges as follows

## I. ALLEGATIONS

1. Craig A. Bimler was a resident of Great Falls, Montana, Cascade County, during the transactions described in this complaint. Craig is now deceased. His father, Allen Bimler, is the Personal Representative of the Estate of Craig Bimler.

2. Defendant Wells Fargo Bank, N.A., is a foreign corporation doing business in the State of Montana.

3. Jurisdiction and venue are proper in this Court because the tortious and wrongful conducted occurred and accrued in Cascade County and Plaintiff is a resident of Cascade County.

4. While he was living, Craig Bimler had an account with Wells Fargo.

5. On May 17, 2022, Craig was notified by Apple that his phone had been hacked. Craig was unaware how this had happened.

6. On or about May 17, 2022, 4 Zelle withdraws occurred from Craig's account with Wells Fargo. The transactions were in the amount $ 500.00 each.

7. Craig had never used Zelle and never enrolled with Zelle. Craig was and was not involved in the transfer. The timing of the transfer suggested it was somehow connected to the hacking of his Apple account.

8. On May 20, 2022, $ 10,000 was wired from Craig's account to Silvergate Bank/Bank Trading Services, LLC.

9. On May 23, 2022, $ 25,000 was wired from Craig's account to Silvergate Bank.

10. On May 26, 2022, $ 10,000 was wired from Craig's account to Silvergate Bank

11. Craig did not approve these wires, had no idea what these wires were for, and had no transactions at all with Silvergate.

12. As soon as Craig noted the wires, he promptly reported these matters to Wells Fargo, informing them that he had not authorized the transactions.

13. Craig also reported the fraud on May 27, 2022, to the Great Falls Police Department.

14. From that point forward, Craig had a number of contacts with Wells Fargo employees regarding his claim in order to get Wells Fargo to refund the money that had been wired out of his account.

15. Craig was had difficulty getting resolution with Wells Fargo via phone, so he went to his local branch in Great Falls. He met with the local branch manager Tammy Farren. Ms. Farren tried to help Craig but was unable to do so.

16. In a letter dated June 6, 2022, Wells Fargo refused to reimburse Craig's for any of the transfers. Wells Fargo claimed in the letter that it had "determined that those transactions were performed by you, or someone using your username and password. Under our Online Wire Terms and Conditions, Online Access Agreement and Deposit Account Agreement, you are responsible for online wires that originate using your username and password, whether or not actually authorized by you."

17. The same response was repeated by Wells Fargo in another letter sent to Craig on June 9, 2022. In the letter, Wells Fargo also stated that "if you would like to get copies of the documents we used to make our decision, please call us . . .".

18. Craig did request the documents.

19. In an email dated July 8, 2022, Wells Fargo discussed its investigations and determinations regarding Craig's claims. Wells Fargo stated that it had determined the transactions were initiated by Craig, or by someone authorized to use his account information. In the email, Wells Fargo said that it had "compelling evidence that determined the transactions were initiated by you or someone authorized to use your account information."

20. In that same email, Wells Fargo also stated "you are entitled to the documentation, which supported the decision to deny the claims. We have submitted a request for the documentation to be provided to you. Our Right to Documentation team will notify you directly via phone call or letter within 30 days."

21. Craig continued to follow up on his claims with Wells Fargo and provide them additional information. In an email dated July 19, 2022, Wells Fargo reversed part of its earlier decision and credited back to Craig the $ 2,000 that had been withdrawn from his

account through the Zelle electronic fund transfers. Wells Fargo stated in the email, "We found the additional information you provided us with sufficient evidence to overturn the previous claim results."

22. However, Wells Fargo declined to reimburse Craig for the $ 45,000 wire transfers.

23. Craig continued his efforts to find out why Wells Fargo was not crediting his wire transfers and submitted an additional complaint to Wells Fargo. In a letter dated August 3, 2022, Wells Fargo responded again, denying it would refund the wire transfers. In the letter, Wells Fargo said that "Our research shows that these wires were requested through secure online banking sessions using your username and password. In addition, we found that the transactions were completed using one-time passcodes that were sent to your phone number on file. Accordingly, it was determined that these transactions were authorized by you or by someone who had your authorization."

24. In the August 3, 2022, letter Wells Fargo stated, "if you have any questions, or would like to get copies of the documents we used to make our decision please call us . . .". However, Craig had already requested this documents and Wells Fargo had agreed to provide them in the July 8, 2022, email.

25. In the email, Wells Fargo again stated that it founded "compelling evidence" supporting its decision not to reverse or credit the wire back to Craig's account. It did, however, refund the $ 90.00 in wire transfer fees.

26. During this time, Craig reached out to the officers of Senator Jon Tester to get assistance on his claim as well.

27. Craig continued to pursue his claim with Wells Fargo. Wells Fargo responded on August 23, 2022, stating that it looked into Craig's concerns further, conducted a further

investigation, and "found compelling evidence supporting the decision that we have already communicated to you."

28. Craig contacted Wells Fargo again to discuss his claim on August 23, 2022, providing Wells Fargo with additional information. Wells Fargo responded on August 25, 2022. Wells Fargo repeated the claim that it had found compelling evidence supporting its decision and refused to reconsider its denial of Craig's claim.

29. In particular, Wells Fargo repeated the assertion that "[o]ur research shows that these wires were requested through secure online banking sessions using your username and password. In addition, we found that the transactions were completed using one-time passcodes that were sent to you phone number on file."

30. Craig contacted Wells Fargo again on August 31, 2022, to speak with Wells Fargo about this claim. In an email dated September 14, 2022, Wells Fargo once again informed Craig that it was denying his claim, for the same reasons stated previously.

31. Craig made numerous efforts to get assistance in having the $ 45,000 dollars returned to him. He contacted the FBI, the office of Senators Steve Daines and Jon Tester, the Federal Trade Commission, and other entities. He was not able to get any help or assistance.

32. Craig passed away on December 30, 2022.

33. Prior to his passing, this ordeal with Wells Fargo caused him an extreme amount of stress. Craig was a paraplegic, having been injured during a trip to Mexico in 2019. Craig needed the funds in his account to pay for his caregiving. Wells Fargo's resistance to his requests, including failing to provide the information which it said that it had in its possession, caused him extreme stress and anxiety.

34. Craig's father, Allen, wrote to Wells Fargo after Craig's passing and referred to the July 8, 2022, email in which Wells Fargo promised to provide him with the documentation supporting its decision within thirty days.

35. Wells Fargo responded on December 27, 2023.  Wells Fargo did not directly respond to the issue Craig raised with respect to the July 8, 2022, but said, "On December 26, 2023, we initiated a request to provide you with the documentation related to the resolution of claim 2022052600910.  We are pleased to inform you that this request has been fulfilled, and you can expect to hear from our Fraud and Claims management team within 30 calendar days."

36. Wells Fargo did not provide Allen with the requested information as promised.  On March 12, 2024, Allen wrote to Wells Fargo again requesting the documentation for its decision.

37. Wells Fargo did not respond to the March 12, 2024 letter.

38. Wells Fargo still has not provided Allen with the documentation supporting its decision not to credit Craig for the wire transfer.

39. Wells Fargo's repeated failure to provide the "compelling evidence" that it said it had to support its decision, and the fact that it suddenly ceased all communications with Allen after his March 12, 2024, letter is a cause for reasonable suspicion.

## COUNT ONE-BREACH OF CONTRACT

40. Plaintiff re-alleges all the foregoing paragraphs herein.

41. Craig and Wells Fargo had an agreement for banking services to be provided by Wells Fargo.

42. The wire transfers from Craig's account to Silvergate Bank were not authorized by

Craig.

43. Pursuant to Section 30-4A-203, MCA, Wells Fargo did not have a right to enforce the order.

44. Wells Fargo breached the agreement with Craig by failing to follow the standards of the commercial code in not refunding Craig for the unauthorized wire transfer when he asked them to do so.

45. Wells Fargo also failed to follow its security procedure as outlined in the agreement for online services for the wire transfers and had no contractual authority to withholding refunding the wire transfers.

46. Wells Fargo is liable to the Estate for the amounts of the unauthorized $ 45,000 wire transfer, plus interest.

## COUNT TWO- TORTIOUS BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

47. Plaintiff re-alleges all the foregoing paragraphs herein.

48. After Craig discovered the unauthorized wire transfers and brought them to Wells Fargo's attention, Wells Fargo was obligated to immediately refund the money.

49. In communications after the wire transfer was brought to its attention, Wells Fargo repeatedly said it had "compelling evidence" to support its decision not to refund Craig's account.

50. Wells Fargo promised to provide the documents supporting its decision and was indeed required to do so pursuant to 12 C.F.R. 205.11(d)(1).

51. Wells Fargo stated that it had the documents supporting its decision, was providing them to Craig, but never did.

52. Upon information and belief, Wells Fargo did not have the documentation as it represented in its communications with Craig and was actively misleading him.

53. Under these circumstances, a "special relationship" has been formed under *Story v. City of Bozeman*, 242 Mont. 436 (1990), based on the following facts:

   a. Craig and Wells Fargo were in inherently unequal bargaining positions with respect to the decision to refund the unauthorized wire transfer, as it controlled the means to do so, and all of the information about whether the wire transfer should have been refunded;

   b. Craig's motivation for entering in a banking relationship with Wells Fargo was for a non-profit motivation, and to seek peace of mind and by having his money in a safe place;

   c. Ordinary contract damages (i.e., simply refunding the money) would not be sufficient to require Wells Fargo to account for its misconduct, and would not make the Estate whole for what Craig suffered as a result of Wells Fargo's failure to refund the money and misleading Craig;

   d. Craig was especially vulnerable because Wells Fargo had all the decision-making power, and access to information; and

   e. Wells Fargo was aware of Craig's vulnerability, his lack of access to information about Wells Fargo's decision, his dependency on Wells Fargo to provide him the information, and how the loss of $ 45,000 would harm him.

54. Wells Fargo is liable for damages for the tortious breach of the covenant of good faith and fair dealing.

**WHEREFORE**, Plaintiffs prays that judgment be entered against the Defendant as follows:

1. A jury trial on all issues of triable fact in this case;

2. For damages in an amount to be determined at trial;

3. For treble damages, fees and costs as allowed under the Montana Consumer Protection

   Act; and

4. Such other and further relief the Court deems just.

   DATED this 5th day of August, 2024

                          By /s/ Brian J. Miller
                              BRIAN J. MILLER
                              MORRISON, SHERWOOD, WILSON & DEOLA PLLP
                              *Attorneys for Plaintiff*